Michael K. Hepworth (15157)
Brandon A. Bourg (17799)
**HEPWORTH & ASSOCIATES, LLC**
320 W 500 S Suite 200
Bountiful UT 84010
801-872-2222 (main)
Michael@HepworthLegal.com
Brandon@HepworthLegal.com
*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

---

| | |
|---|---|
| JOHN VIGIL, LETITIA VIGIL, ABRIANA VIGIL, and DYLAN BECKSTEAD, Utah residents and individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> SALT LAKE CITY, SALT LAKE COUNTY, UNIFIED POLICE DEPARTMENT, ORIN J. NEAL, an individual, JERRY VALDEZ, an individual, JASON ALBRECHT, an individual, JARED STILLION, an individual, and JOHN DOES 1–20, individuals, <br><br> Defendants. | **COMPLAINT** <br><br><br> Case No.: <br><br> Judge: <br><br> Magistrate: |

Plaintiffs John Vigil, Letitia Vigil, Abriana Vigil, and Dylan Beckstead, through counsel, hereby bring this Complaint against Defendants Salt Lake City, Salt Lake County, Unified Police Department ("UPD"), Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and John Does 1–20 for violation of Plaintiffs' Constitutional rights as brought under Title 42, U.S. Code, § 1983.

<u>**INTRODUCTION**</u>

Specifically, Letitia Vigil, Abriana Vigil, the Vigil's minor son "C.C.," and Dylan Beckstead

1

were illegally seized by the named UPD Officers, as well as other UPD Officers identified as John Does 1-20 (hereinafter referred to, together, as the "Officers"), through the evening of February 18, 2021, going into the morning of February 19, 2021. The Officers also searched for and requested the custody of John Vigil, but he was not home at the time. After the illegal seizure, the residence and personal property of John Vigil, Letitia Vigil, Abriana Vigil, and Dylan Beckstead was illegally searched by the Officers.

Based on the facts of this incident, the Officers broke into the Vigil's home and illegally seized John's and Laticia's daughter, Abriana, violating their constitutional right to be free from illegal seizure and excessive force. Dylan's constitutional rights to be free from illegal seizure and excessive force were also violated. After the illegal seizures, the Officers proceeded to continue illegally searching the home where the Plaintiffs live. During the illegal search, the Officers illegally seized personal property owned by John and Letitia. Their personal property was seized "illegally" by definition, as the Officers had no right to assume possession and control of that property given their actual knowledge that the seized property was the result of a patently illegal search. Furthermore, their son C.C. was also subjected to excessive intimidation and force when the Officers pointed firearms at the child and removed him from inside the home as the search was executed. These actions violated Plaintiffs' federal constitutional rights to be free from excessive force, illegal search and seizure, and, similarly, violated related enumerated rights under the Utah Constitution.

During the Officers' illegal activities, they also caused unnecessary damage to the house, to outbuildings on the property, and personal property inside of one of Plaintiff's vehicles. Their actions also damaged personal property belonging to Letitia and Abriana. Further, in addition to property damage, Letitia, Abriana, and other family members have endured emotional pain and suffering resulting from the unnecessary, unreasonable, and reckless actions of the Officers.

2

Furthermore, acts and omissions by Salt Lake County and Salt Lake City have exposed Plaintiffs to these invasive violations of their constitutional rights. Namely, Salt Lake County and Salt Lake City failed to record separate addresses and mailboxes between the Plaintiffs' home address and the separate residence actually targeted by the search warrant, leading to the illegal and excessive search and seizure in this case. This failure to record and make notice to the Officers available regarding the *de facto* separate properties has led to these constitutional violations resulting from negligence flowing from a non-discretionary function.

## **INTRODUCTION**

1.     This Court's jurisdiction arises pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as Plaintiffs assert claims arising under federal laws of the United States over which this Court exercises original federal jurisdiction. Federal jurisdiction is appropriate in this situation as Plaintiffs' claims arise under 42 U.S.C. §1983.

2.     Specifically, Plaintiffs allege that the governments of Salt Lake City, Salt Lake County, the governmental agency of UPD, and certain local officials and agents of one or several of these agencies deprived them of their rights and privileges secured by the United States Constitution and other federal laws set out in this Complaint.

3.     Venue is proper in this court under 28 U.S.C. § 1391(b) as Defendants reside within the District of Utah, and all incidents, events, and occurrences giving rise to this action occurred in this district. At all times relevant hereto, Plaintiffs John Vigil, Letitia Vigil, Abriana Vigil, and Dylan Beckstead were individuals residing in the State of Utah.

4.     Upon information and belief, Defendants Salt Lake County and Salt Lake City were municipal corporations existing under the State of Utah's laws at all times relevant to this Complaint.

5.      Salt Lake County is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies including but not limited to the Salt Lake County Sherriff's Office and Unified Police Department and its agents and employees.

6.      At all times relevant hereto, the County was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Salt Lake County Sherriff's Office and its employees and agents complied with the laws of the United States and the State of Utah.

7.      Salt Lake City is responsible for the actions, omissions, policies, procedures, practices, and customs of its various employees, agents, and agencies, including those tasked with records keeping and promulgating information related to addresses and residences.

8.      At all times relevant hereto, Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and Does 1-10 are law enforcement officers working for the UPD and/or Salt Lake County.

9.      At all times relevant hereto, Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and Does 1-10 were acting under the color of law within the course and scope of their duties as agents or employees of Salt Lake County.

10.      At all the times relevant hereto, Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and Does 1-10 were acting with the complete authority and ratification of their principal, Defendant Salt Lake County.

11.      Upon information and belief, at all times relevant hereto, Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and Does 1-10 were residents of Defendant Salt Lake County, state of Utah.

12.      In doing the acts and failing or omitting to act as described below, Orin J. Neal, Jerry Valdez, Jason Albrecht, Jared Stillion, and Defendants Does 1-10 were acting on the implied

and actual permission and consent of Defendant Salt Lake County.

13.    The true names and capacities, whether individual, corporate, associative, or otherwise of Defendants Does 1-10, are unknown to Plaintiffs who otherwise sue these Defendants by such fictitious names. Plaintiffs may seek leave to amend this Complaint to reflect the true names and capacities of these Defendants if and when new information comes to light.

## STATEMENT OF FACTS

1.    The incident giving rise to this Complaint occurred on February 18 and 19, 2021, at 9753 South Dunsinane Drive in South Jordan City, Utah.  At this address, there is a main living area where Letitia and Abriana Vigil live with John Vigil, Letitia's husband and Abriana's father, and Letitia's two minor sons ("Residence").

2.    At this same address is a separate accessory dwelling unit ("ADU") or apartment that is locked separately and accessed from the outside of the Residence ("Apartment"). The Residence and the Apartment are two separate residences and addresses for the purpose of determining the constitutional scope of the warrant despite both units being located at 9753 South Dusinane Drive.

3.    At approximately midnight, Letitia was in the family room of the Residence grading assignments for a class Letitia was teaching.  Their two minor sons, ages 12 and 8, were upstairs asleep.

4.    Abriana was upstairs in the Residence watching a movie with her boyfriend, Dylan Beckstead.

5.    At approximately midnight or a little after, the UPD SWAT team simultaneously broke down both front doors to the Residence with a battering ram.  At the same time, The Officers broke down an exterior door leading to the basement Apartment.  It caused an explosive

5

noise that rattled the entire house. Multiple Officers entered the house yelling they were from the SWAT team, that they had a search warrant. They were carrying high luminosity flashlights and waving and pointing guns at Letitia.

6.     When she heard the noise, Abriana left the room where she and Dylan were watching a movie. She came to the head of the stairs and saw multiple Officers pointing their guns at her. They ordered her to come down the stairs. When she was still four or five steps from the bottom, officers grabbed her and yanked her the rest of the way down the stairs.

7.     The Officers then handcuffed Abriana and asked her who Joel Mendoza was. She said she did not know and explained that it might be the basement renter's boyfriend. The Officers forced her outside into the cold air, and though Abriana asked multiple times what was going on, no explanation was given to her.

8.     Dylan followed Abriana out of the room to investigate the noise. The Officers, with their guns pointing at him, told him to stay at the top of the stairs. The Officers asked Dylan where Joel Mendoza was; Dylan answered that he had never heard the name.

9.     The Officers then asked Dylan who else was upstairs, with him replying that no one else was upstairs except Letitia's two sons who were sleeping in their rooms. The Officers, still pointing their firearms at him, ordered him to come downstairs with his hands in the air. Once he reached them, they grabbed him, roughly handcuffed him, and forced him out into the dangerously cold night air. Dylan asked multiple times what why he was being detained, and again, no explanation was given. The Officers then detained the Vigil's minor son, C.C.

10.     When the front door was broken down, Letitia immediately thought it was a break-in and looked for the phone to call 911. She went to the ground and hid behind some furniture. When she heard it was the UPD Officers, she stood up to find the Officers with guns and bright

6

flashlights trained on her.

11.     The UPD Officers, with guns pointed at her, ordered Letitia to walk backwards towards them with her hands up.  She fully complied thinking, "If I make one wrong move, they could shoot me."

12.     She asked the Officers multiple times who they were looking for and if could she help them.  No explanation was given.  She was placed in handcuffs.

13.     Letitia, when asked, explained to the officers that Abriana, Dylan and her two sons were the only people in the Residence.  She told the Officers there was a separate downstairs Apartment occupied by a woman and her daughter.

14.     At the same time the Officers broke through the doors to the Residence, they also broke through the outside door into the separate, downstairs Apartment.

15.     The Officers asked Letitia how to access the downstairs Apartment.  Letitia explained they would have to go outside to a completely separate door next to the garage that would allow them entry into the Apartment.  She also explained that there was an inside door accessing the apartment, but it was always kept locked.  Because she was handcuffed, she could only give them directions to the inside door with her head.

16.     At this stage of the search, within the first few minutes, it was established that the Officers knew: 1) there was a separate Apartment with a separate, outside entry which they had already broken through; and, 2) no-one named Sandra Lisette Barajas-Mercado or Diego Barajas lived in the Residence.

17.     Prior to the late-night entry of February 18/19, 2021, the Officers were aware that there was a basement Apartment at 9753 South Dusinane Drive based on two facts:

        a.  John Vigil, the owner of the home, had received municipal approval from South

Jordan City to remodel the property and build an accessory dwelling unit ("ADU") as a separated, locked apartment in March 2013. The certificate of occupancy was issued in March 2013. The officers pre-search investigation of the 9753 South Dusinance Drive title history would have revealed the approval for the ADU as a separate, individual dwelling unit.

b.  On or about October 28, 2020, two officers from UPD, a uniformed officer and a plainclothes officer, came to the Residence. They met Abriana who was on her way to school. They asked her if she knew "Sandra." She explained that she knew who she was and that she lived in the separate downstairs apartment, but that was the extent of her knowledge. The two officers asked Abriana to show them how to access the downstairs apartment. Abriana showed them the outside apartment door and told them, as best she knew, when Sandra was typically at home. The officers continued to look around the property while Abriana left for school.

18.    Whether or not the Officers on the scene were aware, prior to February 18/19, 2021, that the target of their search warrant lived in a separate downstairs Apartment, they knew within minutes after breaking down the front doors of the Residence and questioning Letitia that: 1) the two individual subjects of the search warrant did not live in the Residence; 2) there was a separate, locked downstairs Apartment; and, 3) one of the two subjects of the search warrant lived in that separate downstairs Apartment. This was the first point at which the Officers knew or should have known that Plaintiffs, who they had detained that night after this point, were not subjects of the search warrant.

19.    Once the Officers realized their search was illegal, they should have requested a second warrant to search the Residence. There was ***no probable cause or any evidence in plain***

8

*view* that would have justified the continued search of the Residence.

20.    Once they knew that they were searching a location not covered under the search warrant, the Officers should have called off the search of the Residence and the seizure of Letitia, Abriana, and Dylan and focused their search on the Apartment and Sandra. However, they did not.

21.    After being handcuffed, Letitia was taken outside to the SWAT van where she was joined by Abriana, C.C., and Dylan, who were both handcuffed, and her 12-year-old son. She continued to ask about her 8-year-old son and was told the Officers were checking on him.

22.    Letitia, Dylan Abby, and C.C. were removed from the SWAT van, Abby and Letitia were patted down by a female officer and were still denied any explanation of what was going on.

23.    After being searched, the Plaintiffs were put in separate vehicles, except for Letitia who was placed in an officer's SUV where C.C. was waiting.

24.    Thirty or forty minutes or so after the break-in, one of the Officers told Letitia her son was still asleep in his bedroom and that they were not going to disturb him. They removed Letitia's handcuffs while she was with her 12-year-old son.

25.    One of the Officers told Letitia that her husband, John, was not an object of or person of interest in their search. They were looking for the basement tenant's boyfriend. This was the third point at which Officers knew or should have known the people they had detained in the Residence were not subjects of the search warrant.

26.    One of the Officers came to the SUV to ask Letitia about Sandra's boyfriend. He explained to Letitia that the person of interest to them was Sandra's boyfriend. Letitia explained she had only met Sandra a few times and had never met her boyfriend, didn't even know his name.

She explained that he was rarely at Saundra's apartment. She also explained to the officers that Sandra had recently asked if her boyfriend could live in the apartment, but that she did not want his name on the lease.

27.    Again, once the Officers recognized they were searching the wrong location and had detained the wrong individuals, the Officers should have called off the search of the Residence and the continued seizure of Letitia, Abriana, and Dylan and focused their search on the Apartment and Sandra. However, they did not.

28.    Letitia asked one of the Officers why they were being held and searched if Sandra was the object of the search warrant. She was told that because the Apartment didn't have a separate address, they were entitled to search the Residence because they considered the property to be one dwelling.

29.    After approximately thirty minutes, Sandra, the downstairs Apartment tenant and subject of the search warrant, came out in handcuffs, followed by her 13-year-old daughter.

30.    One of the Officers brought Sandra's 13-year-old daughter and put her in the SUV with Letitia and her 12-year-old son. The officer asked Sandra's daughter about her mother's boyfriend. She reported he had moved out of the Apartment a few weeks before.

31.    One of the Officers admitted to Letitia that neither she, Abriana, or Dylan were targets of the search warrant. This was the second point at which Officers knew or should have known that the people they had detained in the Residence were not subjects of the search warrant.

32.    Approximately fifty minutes after the break-in, the SWAT team and vans left the Residence. The Officers along with other UPD Officers remained and continued searching. Letitia and her son were kept outside in the SUV.

33.    Roughly an hour after the break in, Letitia and her son were taken back inside

the Residence. Abriana, Dylan and Sandra were already in the living room. Abriana and Sandra were still handcuffed, and soon after the Officers removed Abriana's handcuffs. However, Sandra remained handcuffed until the police officers left the Residence.

34.     Detective Neal gave Letitia a copy of the search warrant with no further explanation. She learned for the first time that the search warrant specifically listed Sandra Lisette Barajas Mercado and a Diego Barajas as the focus of the warrant. It mentioned probable cause for their involvement in the distribution of narcotics, firearms, cash, and electronics. Letitia had never heard the name of Diego Barajas.

35.     Though not on the search warrant, the Officers continued to ask Letitia, Abriana, and Dylan about Joel Mendoza. Mr. Mendoza seemed to be of great interest to the Officers. Letitia, Abriana, and Dylan explained they had never heard of Joel Mendoza before.

36.     The Officers never answered Letitia's questions regarding why they had been handcuffed and searched if the purpose and focus were clearly on other people. The Officers were trying to keep Letitia in the dark, to confuse her because she had continued to object to the ongoing search of the Residence.

37.     Letitia once again objected to the search of the Residence asking a female Officer why they were searching the whole entire Residence if they were only interested in the basement Apartment tenant, her brother, and her boyfriend.

38.     The female Officer explained that they had the right to search the whole house. The property was considered one singular unit because the basement apartment wasn't established as a separate dwelling unit.

39.     The attempts by the different Officers to explain their right to search the whole house, even though they knew the focus should have been only on Sandra and the separate Apartment,

shows that: 1) they were ignoring clearly established law; and 2) that they intended to confuse Letitia in order to illegally search the Residence no matter what the actual circumstances were. The Officers also intentionally caused duress and represented a false choice to Letitia to compel her to give the Officers permission to expand their search, interpreting their warrant as an unconstitutional general warrant.

40.     While the illegal search of the Residence was ongoing, one of the Officers joked with his colleagues that if they found a bazooka it was his to keep.

41.     Early in the SWAT operation, the Officers cut the power lines to Letitia's security cameras. This was done so John, Letitia, Abriana, and Dylan would not have a video record of the SWAT break-in.

42.     Roughly two hours after the break-in, Letitia was taken to a separate room where Detective Neal explained to her that even though her handcuffs were off, she was still detained. He asked if she would be willing to answer questions without an attorney present. Letitia agreed. He asked about illegal activity in the downstairs apartment and about Sandra's boyfriend. She explained she knew nothing about any illegal activity and that she didn't know Sandra's boyfriend or his name and had only seen him a couple of times. The officer asked about John Vigil, Letitia's husband, and his past history. Letitia explained she had moved into the Residence only a few weeks before and was aware that John had problems with the law in the past, but that she understood his problems were over and from many years before.

43.     The officer asked Letitia if there were guns in the household. Letitia answered that she and John owned guns some of which were kept locked up downstairs. She believed there were other guns, but she wasn't sure where there were kept. She thought they might be kept somewhere downstairs.

12

44.    Shortly thereafter, Officers asked Abriana for a key to the locked storage room in the basement of the Residence. Letitia and Abriana told them they didn't have a key to the locked storage room. One of the Officers asked Abriana to call her father, John, and ask him. John, surprised by the call, explained that there wasn't a key to the storage room, that he used a screwdriver to open it up. The call was on speaker so that it could be heard by the Officers and Letitia.

45.    The Officers asked Letitia and Abriana about a large safe which they had found downstairs. Letitia and Abriana stated they were unaware of a safe or how to get into it. Abriana again called her father. The call was on speaker. Her father told Abriana that a key for the safe was in the locked storage room. The Officers took a grinder and, without permission, ground off the door hinges of the safe in order to access it. They found personal paperwork.

46.    The Officers went downstairs in the Residence and, without permission, pried open the locked storage room door where Letitia and her husband kept some of their firearms safe. The officers removed all of the guns, including guns owned by Letitia.

47.    The Officers never requested Letitia's consent to search the Residence. In fact, Letitia objected to the continued search. Letitia never gave her consent that the Residence could be searched at any time.

48.    Letitia overheard Officer Valdez, Stillion and other Officers discussing whether to search the separate garage in the far corner of the property. She offered to provide the keys to the officers. The Officers ignored Letitia and, without permission, broke open the lock on the garage door to search the garage.

49.    The Officers found car keys during their search of the house and, without permission, searched vehicles that were on the property. They demanded keys for the RV's that they had found on the property. They told Letitia they were asking so they could enter the RV's "nicely."

13

Letitia explained that the RV's did not belong to them, they were being stored for others.

50.    When Letitia asked why they were taking possession of her guns, the Officers explained that Letitia couldn't possess a gun because of the narcotics charge for the downstairs tenant. She explained that the guns were hers and that she had no criminal record.  The Officers explained that it didn't matter, the guns were now part of the overall investigation. Letitia was told by one of the Officers that she was now part of the investigation of Sandra's illegal activities based on the findings of the search warrant.

51.    Letitia asked the Officers how she was supposed to know whether or not her tenants are participating in criminal activity. One of the Officers answered that it was her responsibility to do sufficient due diligence and background checks.

52.    The Officers caused considerable damage to personal items and to the Residence during their search. Letitia asked who would pay to repair the damage.  She was told to contact UPD Risk Management, that they may or may not compensate for the damage.

53.    The last of the Officers finally left the Residence between 3:00 and 3:30 a.m.

54.    As the last of the Officers left, one of them turned to Letitia and Abriana to apologize saying, "Sorry for the confusion.  Have a nice night."

55.    The Officers allegedly found a syringe of liquid heroin in Sandra's apartment.

56.    The Officers found guns and ammunition belonging to Letitia.

57.    The forced break-in and illegal search by the Officers left damage to the house and destruction of personal property owned by John, Letitia and Abriana. The damage and destruction were unnecessary and did not need to occur as part of the search.

58.    The forced break-in and search by the Officers caused significant emotional damage, pain and suffering to John, Letitia, Abriana, Dylan, Letitia's children.  The emotional

14

damage, pain and suffering were unnecessary and did not need to occur as part of the search.  It will affect them the rest of their lives.

59.    Letitia and Abriana, through counsel, requested police records, body cam video and other information from UPD on April 8, 2021.  To date, only a portion of the police records have been provided.

## FIRST CAUSE OF ACTION
### Unlawful Detainment and Seizure–Violation of Fourth Amendment
(Cognizable under 42 U.S.C. §1983)

60.    Plaintiffs incorporate all other paragraphs herein.

61.    Letitia, Abriana, and Dylan were illegally seized and detained by the Officers, with C.C. also being seized and handled with unnecessary force and severity.

62.    There was no reason to seize or handcuff Letitia, Abriana, and Dylan.

63.    Neither John, Letitia, Abriana, nor Dylan had committed any crime.

64.    For officers to seize an individual, the officers "***must have a particularized and objective basis*** for suspecting the particular person … of criminal activity." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (emphasis added). Otherwise, the seizure is a violation of an individual's Fourth Amendment rights.

65.    The Officers broke into the Residence based on a no-knock search warrant issued to UPD Officers.  The search warrant identified the 9753 S. Dunsinane Drive address and the two subjects of the warrant, Sandra Lisette Barajas-Mercado and Diego Barajas.

66.    Letitia was handcuffed at gunpoint without being told the reason for her being detained.

67.    Abriana was handcuffed at gunpoint without being told the reason for her

15

being detained.

68.    Dylan and C.C. were handcuffed at gunpoint without being told the reason for them being detained.

69.    Neither John, Letitia, Abriana, Dylan, nor C.C. resisted detention. John was not physically present at the time but was not evading the Officers and was attempting to return home when the Officers left.

70.    John, Letitia, Abriana, Dylan, and C.C. were fully cooperative with the Officers, including during their detention, where applicable to those Plaintiffs detained.  They answered all questions asked of them and gave them directions on how to access the outside, separate Apartment where Sandra lived.

71.    Within only moments of entering the Residence, Officers were fully aware and knew that: 1) the people occupying the Residence were John, Letitia, Abriana, Dylan and Letitia's two sons; 2) the focus of the search, Sandra and Diego, were not present in the Residence and did not live in the Residence; and 3) there was a separate, locked Apartment where the Officers' named subject, Sandra, lived which was accessed by a separate, outside door.

72.    Once Officers realized and understood they had entered a separate dwelling unit that had no link to the focus and terms of their search warrant, they should have discontinued any further activity in the Residence and focused their search and seizure activities on the separate Apartment and Sandra.  Officers were "***required to discontinue the search*** … as soon as they discovered there were two separate units … and therefore were put on notice of the risk that they might be in *a unit erroneously included* within the terms of the warrant." *Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (emphasis added).

73.    Once Officers realized they had detained John, Letitia, Abriana, Dylan, and

16

C.C. who lived together in a completely separate dwelling unit and who were not the two individuals identified as the subjects of their search warrant, the Officers should have immediately realized their error, released them from detention, and removed their handcuffs. "[A]n officer's authority to detain an occupant of a residence while searching for contraband pursuant to a warrant *lasts only as long as the search is proper*." *Harman v. Pollock*, 586 F.3d 1254, 1262 (10th Cir. 2009) (emphasis added).

74. Salt Lake City's and Salt Lake County's failure to properly record the fact of separate dwelling units and record the separate mailboxes for these dwellings directly contributed and caused his initial error on the part of the Officers.

75. It is undisputed that the Officers knew or should have known as soon as they had spoken to Letitia that the search warrant was in error because it did not identify the separate, basement Apartment as the object of the search.

76. Officers knew that the error meant their continued search of the Residence was improper and illegal.

77. Officers knew that the error meant their continued detention of Letitia, Abriana, Dylan, and C.C. was improper and illegal.

78. Even though the Officers knew what they were doing was illegal, they continued their search of the Residence and their detention of Letitia, Abriana and Dylan.

79. Officers admitted to Letitia that she, Abriana and Dylan were not the individuals named in the search warrant and were not the persons of interest for whom their search warrant was issued.

80. Officers admitted that John Vigil, Letitia's husband, was not the person of interest for whom their search warrant was issued

81. Even if the initial entry into the Residence might be considered permissible

17

based on the Officers' reliance on the mistaken information in the warrant, the continuing search of the Residence after they were aware of their error was unreasonable and illegal.

82.    Even if the initial detention might be considered permissible based on the Officers' reliance on the mistaken information in the warrant, the continuing seizure of Letitia, Abriana, and Dylan after they were aware of their error was unreasonable and illegal.

83.    It is clearly established in the Tenth Circuit that the Officers violated Letitia's, Abriana's and Dylan's constitutional rights by the unreasonable and illegal seizure and continuing detention on February 18/19, 2021.

84.    The Officers are not entitled to qualified immunity based on their unlawful and illegal seizure because they violated a constitutional right that was clearly established prior to their actions.

85.    Letitia, Abriana, Dylan, and C.C. have been damaged by the infliction of stress and fear, causing PTSD, as well as the pain and emotional suffering resulting from the circumstances surrounding the illegal seizure.

86.    No remedy exists to make Letitia, Abriana, and Dylan whole.

87.    The conduct of Officer Does warrants the imposition of punitive damages as may be allowed by law.

## SECOND CAUSE OF ACTION
### Use of Excessive Force–Violation of Fourth and Fourteenth Amendments
(Cognizable under 42 U.S.C. §1983)

88.    Plaintiffs incorporate all other paragraphs herein.

89.    There was no evidence or information that might have given Officers probable cause to detain Letitia, Abriana, Dylan, or C.C.

90.    Neither Letitia, Abriana, Dylan, nor C.C. had committed no crime and were not

suspected of having committed any crime.

91.    Neither Letitia, Abriana, Dylan, nor C.C. were an immediate threat to the Officers. They had no weapons, they had not threatened the officers either physically or verbally, and they were no threat to anyone else.

92.    Neither Letitia, Abriana, Dylan, nor C.C. were fleeing or resisting the Officers' attempts to detain them.

93.    Letitia, Abriana, Dylan, and C.C. were fully cooperating with the Officers.

94.    Letitia, Abriana, and Dylan asked multiple times why they were being detained and handcuffed. The Officers never provided an explanation.

95.    Once the Officers realized they were in a separate dwelling unit and had detained individuals who were not persons of interest in the search warrant, they should have immediately released Letitia, Abriana, Dylan, and C.C. from detention and removed the handcuffs. *See* ¶¶ 68-69 herein.

96.    The Officers' use of handcuffs to enforce the continued illegal detention of Letitia, Abriana, Dylan, and C.C. was excessive force.

97.    While the initial handcuffing may have been justifiable based on the Officers' mistaken information in the search warrant, after they realized their search was improper and illegal, their right to detain also became improper and illegal. They had no further right to detain and handcuff Letitia, Abriana, Dylan, and C.C. "[T]he justifiable initial use of handcuffs can become unreasonable if other factors ***such as prolonged duration***, affect the balance of interest under *Graham*." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (brackets and emphasis added; quotations omitted).

98.    It is clearly established and should be well known to a trained, police officer

that an individual's constitutional rights are violated by unreasonably continuing to handcuff the individual after it is known probable cause does not exist and the individual is fully cooperating, has committed no crime, is not a threat to the officers or themselves, and is neither fleeing nor resisting. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

99.     The Officers are not entitled to qualified immunity based on their unlawful use of excessive force because they violated clearly established constitutional rights.

100.    Letitia, Abriana, Dylan, and C.C. have been damaged as alleged in Claim #1, which is incorporated herein by reference. "[T]o recover on an excessive force claim [for handcuffing], a plaintiff must show [. . .] some actual injury caused by the unreasonable seizure that is not de minimus, *be it physical or emotional*." *Fisher*, 584 F.3d at 894 (emphasis and brackets added).

101.    Harm to C.C. has affected Letitia, Abriana, Dylan, and John financially and emotionally.

102.    No remedy exists to make Letitia, Abriana, and Dylan whole.

103.    The conduct of the Officer Does warrants the imposition of punitive damages as may be allowed by law.

### THIRD CAUSE OF ACTION
**Unlawful Search and Seizure–Violation of Fourth Amendment**
(Cognizable under 42 U.S.C. §1983)

104.    Plaintiffs incorporate all other paragraphs herein.

105.    Within only moments of breaking into Letitia's home, the Officers knew that neither the Residence nor the individuals they had detained were the subjects of the search warrant.

106.    At that point, they knew or should have known that any further detention of Letitia, Abriana or Dylan or the continued searching of the premises would have been illegal. *See*, ¶¶ 67 – 69 herein.

20

107.    Letitia did not consent to any extension of the search of the Residence and the Officers did not ask her, at any time, whether they could continue searching the Residence.

108.    The Officers had no probable cause or "plain view" evidence in their possession that would have allowed them to extend the search of the Residence. *Harman,* 586 F.3d at 1264. The Officers "knew or should have known that they had entered a home that was unconnected to the illegal activity described in the warrant, therefore triggering an immediate duty to retreat." *Id.*, at 1265.

109.    Given that the Officers knew the search was illegal, anything seized in the ongoing, illegal search of the Residence would be considered as illegally obtained and would be suppressed.

110.    The Officers, even after they knew their search of the Residence was illegal and should have ended, continued to search.

111.    Letitia, Abriana, and Dylan continued to answer the Officers questions because they were handcuffed and detained. Letitia, Abriana, and Dylan did not know whether or not the search was illegal.

112.    Letitia, Abriana, and Dylan asked multiple times why they were being detained. They received no answer from the Officers until well after they had been detained.

113.    Letitia objected to the continuing search after she was told that she, John, Abriana and Dylan were not the objects of the search warrant; that the Officers' stated object of the warrant was to find information from the Apartment regarding Sandra, her boyfriend and Joel Mendoza.

114.    After seeing the search warrant, Letitia again objected to the propriety of the Officers' continued search of the Residence.

115.    The Officers explained, at least twice, that their search was legal since there was no differentiation on the address between the Residence and the Apartment.  This was simply contrary to established law. The Officers knew or should have known that they were telling John, Letitia, Abriana, and Dylan a lie for the purpose of extending and continuing their illegal search.

116.    The Officers are not entitled to qualified immunity based on their unlawful and illegal seizure because they violated clearly established constitutional rights.

117.    Letitia has been damaged by the loss of personal property which the Officers had no right to take.

118.    The only remedy that exists to make Letitia whole from the damages is to either return the illegally seized property to her or compensate her for the property taken.

119.    The conduct of the Officer Does warrants the imposition of punitive damages as may be allowed by law.

## FOURTH CAUSE OF ACTION
### Failure to Intervene–Violation of Fourth and Fourteenth Amendments
(Cognizable under 42 U.S.C. §1983)

120.    Plaintiffs incorporate all other paragraphs herein.

121.    Within only moments of breaking into Letitia's home, the Officers knew that neither the Residence nor the individuals they had detained were the subjects of the search warrant.

122.    At that moment, Officers knew or should have known that it was improper and illegal for them to continue to search the Residence or to hold John, Letitia, Abriana, and Dylan in detention.

123.    However, knowing that they or their fellow Officers were acting in violation of the constitutional rights of John, Letitia, Abriana and Dylan, the Officers did nothing to correct the situation.

22

124.     One of the Officers even joked about keeping a bazooka if one were found on the premises.  This speaks to the joking, lax attitude that officers took toward the illegal seizure and search.

125.     Each and every one of the Officers involved in the subject incident was aware of the violations of rights against John, Letitia, Abriana, and Dylan including use of excessive force, illegal search and illegal seizure.  None of them did anything to prevent the continuation of the violation, even after they knew for certain that they were illegally extending both the search and the detention.

126.     One of the Officers, upon leaving after three and a half hours of searching, even felt it necessary to apologize for the confusion they themselves had recklessly and negligently created.

127.     When an officer is aware of the violation of constitutional rights being committed by another officer against a victim and does not intervene to prevent such violations, that officer may be held liable under §1983 for failure to intervene.  "It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section §1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (quoting *Mascorro v. Billings*, 656 F.3d 1198, 1204 (10th Cir. 2011)).

## FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTION
### Illegal Seizure–Violation of Utah Constitution Article I, Section 7
### Excessive Force and Unnecessary Rigor–Violation of Utah Constitution Article I, Section 9
### Illegal Denial of Due Process–Violation of Utah Constitution Article I, Section 14

128.     Plaintiffs incorporate all other paragraphs herein.

129.     Article I of the Utah Constitution, similar to the U.S. Constitution,

provides protection of basic rights for its citizens, as follows:

    a.  Against illegal seizure – Section 7;

    b.  Against excessive force and unnecessary rigor – Section 9;

    c.  Against denial of due process – Section 14.

130.    Officer Does 1 – 35, as explained above, flagrantly violated the Utah Constitutional rights of Letitia, Abriana, Dylan, and C.C. when they illegally seized them.

131.    Officer Does 1 – 35, as explained above, flagrantly violated the Utah Constitutional rights of John, Letitia, Abriana, Dylan, and C.C. when they used excessive force in continuing to unreasonably handcuff them even after they knew they were not the subjects of the search warrant.

132.    Officer Does 1 – 35, as explained above, flagrantly violated the Utah Constitutional rights of Letitia, Abriana, Dylan, and C.C. by denying them due process.

133.    John, Letitia, Abriana, Dylan, and C.C. have been damaged as set forth in Claim 1, which is incorporated herein by reference.

134.    No remedy is available for the illegal seizure, use of excessive force and unconstitutional search and seizure brought upon Letitia, Abriana, Dylan, and C.C.

135.    The conduct of Officers 1 – 35 warrants the imposition of punitive damages as may be allowed by law.

136.    The conduct of Salt Lake City and Salt Lake County in failing to properly record and notice the fact of separate dwellings between Plaintiffs' residence and exposed Plaintiffs to these constitutional violations and directly contributed to and caused them by subjecting Plaintiffs to what in effect became a general warrant without sufficient particularity under the Fourth Amendment.

24

**EIGTH CAUSE OF ACTION**
**Failure to Train or Supervise**
(Cognizable under 42 U.S.C. §1983)

137.    Plaintiffs incorporate all other paragraphs herein.

138.    On February 18/19, 2021, as described above, UPD, through its Officer Does 1 – 35, perpetrated a flagrant, outrageous, unreasonable and conscience shocking illegal seizure of Letitia, Abriana, Dylan, and C.C.

139.    On February 18/19, 2021, as described above, UPD, through Officer Does 1 – 35, perpetrated an outrageous, unreasonable and conscience shocking illegal use of excessive force in the continuing handcuffing of Letitia, Abriana, Dylan, and C.C.

140.     On February 18/19, 2021, as described above, UPD, through Officer Does 1 – 35, perpetrated an outrageous, unreasonable and conscience shocking illegal search of the property of Letitia, Abriana, Dylan, and C.C.

141.    There was no reason for the Officers to either seize or use excessive force against Letitia, Abriana, Dylan, or C.C.

142.    There was no reason for the Officers to seize property owned by Letitia, Abriana, Dylan, or C.C.

143.    UPD had a duty to fully and adequately train and supervise their Officers to adhere to the proscriptions against unreasonable, illegal seizures and searches and against the unreasonable, illegal use of excessive force in accordance with clearly established law pursuant to the Fourth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 7, 9 and 14 of the Utah Constitution.

144.    UPD knowingly and recklessly failed to adequately train and/or supervise its Officers to adhere to the proscriptions against illegal and unreasonable searches and seizures and use

of excessive force in accordance with the clearly established law pursuant to the Fourth and Fourteenth Amendments as well as Article I, Sections 7, 9 and 14 of the Utah Constitution.

145.    The failure of UPD to train and to supervise its Officers to adhere to these proscriptions demonstrates a reckless indifference to the rights of the people they should be protecting, including Letitia, Abriana, Dylan, and C.C.

146.    The effect of this indifference was to expose individuals to unreasonable searches, seizures and excessive force, as occurred in this encounter.

147.    The inaction of UPD in applying punishment or any other consequence to the bad behavior of the Officers, provides tacit approval to other employees that such behavior is condoned and approved.

148.    The failure of UPD to fully and adequately train and supervise its Officers and/or to enforce its policies, procedures and customs warrants the imposition of those punitive damages as may be allowed by law.

149.    John, Letitia, Abriana, Dylan, and C.C. have been damaged as alleged in Claim 1, which damages are incorporated herein by reference.

### NINTH CAUSE OF ACTION
**Negligence against Salt Lake City and Salt Lake County**
(Cognizable under Utah Code Sections 63G-7- 201(4)(b))

150.    We incorporate all other paragraphs as if specifically articulated herein.

151.    The failure of Salt Lake City and Salt Lake County to properly act on their duty to sufficiently and accurately record and provide notice of separate dwellings has led to the events at issue in this matter, namely the raid by UPD that left Plaintiffs with property damage and emotional damage as previously articulated pursuant to this raid.

152.    This failure falls under an exemption of government immunity under the Utah

Government Immunity act, since this failure was a tort rising to negligence that led to civil rights violations and mental anguish as outlined under Utah Code Section 63G-7- 201(4)(b).

153.    John, Letitia, Abriana, Dylan, and C.C have been damaged as alleged in Claims 1 - 6, which damages are incorporated herein by reference.

## INJURIES AND DAMAGES

154.    Plaintiffs incorporate all other paragraphs herein.

155.    Letitia, Abriana, and Dylan were illegally seized by Officer Does 1 – 35.

156.    Letitia, Abriana, and Dylan were exposed to excessive force during their detention at the hands of the Defendants.

157.    John's and Letitia's house was illegally searched with property illegally seized by Officers 1 – 35.

158.    Personal property owned by John, Letitia, Abriana, and Dylan was destroyed by Officers 1 – 35.

159.    Significant damage was done to the Residence during the search caused by the recklessness of Officers 1 – 35.

160.    Significant emotional distress was inflicted upon John, Letitia, Abriana, and Dylan by Defendants due to their excessive force and sudden, unlawful seizure of their property.

161.    We incorporate herein by reference all other paragraphs relating to damages.

## PRAYER FOR RELIEF

Given the outrageous and shocking facts in this case, John, Letitia, Abriana, and Dylan ask that this Court grant relief according to the following:

162.  Judgement against Defendants for violation of Plaintiffs' constitutional rights.

163. Judgement for an amount equal to the amount Plaintiffs have suffered from Defendants tortious conduct, including that property damage Defendants caused to Plaintiffs' Residence and personal property, to that amount to be determined at trial and not less than $50,000.

164. Judgement for an amount equal to that which may compensate Plaintiffs for their emotional distress, pain and suffering, and trauma resulting from Defendants' actions to that amount to be determined at trial and not less than $500,000.

165. Reasonable attorney's fees as permitted by law.

166. Punitive and treble damages to that extent determined by the facts and applicable by law.

167. Any other relief the Court deems just and equitable.

DATED July 7, 2022.

/s/ *Brandon A. Bourg*
BRANDON A. BOURG
Attorney for Plaintiff